UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RASON ANGELO HORTON,

Petitioner,

v.                                          CASE NO. 2:08-cv-12798

SHERMAN CAMPBELL,                           PAUL D. BORMAN
                                            UNITED STATES DISTRICT JUDGE
Respondent.

_____/

## OPINION AND ORDER DENYING PETITIONER'S MOTION FOR A STAY (ECF No. 42], DENYING THE AMENDED HABEAS CORPUS PETITION (ECF No. 21), GRANTING IN PART A CERTIFICATE OF APPEALABILITY, AND GRANTING PERMISSION TO APPEAL THIS DECISION *IN FORMA PAUPERIS*

This matter has come become the Court on petitioner Rason Angelo

Horton's *pro se* amended habeas corpus petition under 28 U.S.C. § 2254. *See* Am.

Pet. (ECF No. 21). Also pending before the Court is Petitioner's recent motion for

a stay of this case while he pursues state remedies. *See* Mot. Requesting

Subsequent Stay (ECF No. 42). The amended habeas petition challenges

Petitioner's Michigan convictions for first-degree (felony) murder, Mich. Comp.

Laws § 750.316(1)(b), armed robbery, Mich. Comp. Laws § 750.529, carjacking,

Mich. Comp. Laws § 750.529a, felon in possession of a firearm, Mich. Comp.

Laws § 750.224f, and possession of a firearm during the commission of a felony

("felony firearm"), Mich. Comp. Laws § 750.227b.

Petitioner raises four claims regarding his statement to the police, evidence about a subsequent robbery, and the trial court's failure to order a mistrial when certain items were mistakenly given to the deliberating jurors. (ECF No. 21). Petitioner also claims to be innocent of the crimes for which he is incarcerated. (*Id.*)

The State filed an answer to the amended petition in which it argues that Petitioner's claims are waived or procedurally defaulted, are not cognizable on habeas review, or were reasonably decided by the Michigan Court of Appeals. *See* Answer in Opp'n to Pet. for Writ of Habeas Corpus (ECF No. 26, PageID.246-47).

In his recent motion for a stay, Petitioner asks the Court to hold his amended petition in abeyance while he exhausts state remedies for four new claims about an eyewitness's observations of the criminal incident, the state prosecutor's conduct, the pretrial identification procedure, and his former appellate attorney. (ECF No. 42).

Having reviewed the pleadings and the state-court record, the Court concludes that Petitioner is not entitled to a stay and that his current claims do not warrant habeas relief. Accordingly, the Court is denying the motion for a stay and the amended petition.

## I.  The Facts

Petitioner was charged with open murder, armed robbery, carjacking, felon-in-possession of a firearm, felony firearm, and two counts of assault with intent to commit murder. The charges arose from a robbery, carjacking, two assaults on eyewitnesses, and the fatal shooting of a clerk at the BP Amoco gas station on Packard Road in Ann Arbor, Michigan. The Court will refer to this incident as the "Ann Arbor robbery" or the "BP Amoco robbery."[1]

Petitioner was tried before a jury in Washtenaw County Circuit Court. William Close testified that he was working for Yellow Cab on September 3, 2004, and that he was dispatched to the Motel 6 in Ann Arbor about 5:30 a.m. that day. The name on the order was "Roc." A black male dressed in a white T-shirt and dark jeans and wearing a rag on his head eventually came out of the motel and asked to be taken to the Packard and Platt Amoco station. They arrived at the gas station about 6:00 a.m. After dropping off his passenger, Close saw the man heading toward the front door of the gas station. Later that day, he read an article about a robbery at the gas station, and his dispatcher then notified the police that he

---

[1]  One of the issues in this case is the prosecution's use of evidence regarding a subsequent robbery of a Marathon gas station in Detroit, Michigan. The Court will refer to the subsequent robbery as the "Marathon robbery" or "the Detroit robbery."

had taken someone there. Mr. Close was unable to identify the person at trial. *See* 6/14/05 Trial Tr. at pp. 79-90 (ECF No. 27-8, PageID.600-03).

Petitioner's former girlfriend, Anna Lisa Rampersad, testified about spending time with Petitioner at the Motel 6 and elsewhere in Ann Arbor from August 31, 2004 to September 2, 2004. When she last saw Petitioner on September 2, he was dressed in jeans and a T-shirt, and he may have been wearing a hat or do-rag. The next day, he called her at about 8:00 a.m., and again at about 8:00 or 9:00 p.m. from an unfamiliar number, to see what she was doing. *See id*. at pp. 92-111 (ECF No. 27-8, PageID.603-08).

Kathy Baum stopped at the gas station at Packard and Platt about 5:45 a.m. on September 3, 2004. A Yellow Cab pulled in behind her shortly after she arrived there. She saw a man get out of a cab and walk toward the adjacent apartments. He was a young African American man in dark clothing, but she could not identify him at trial. *See id.* at pp. 140-60 (ECF No. 27-8, PageID.615-20).

Helen Skyles saw two men arguing near the BP Amoco gas station about 6:00 a.m. on September 3, 2004. One of the individuals was a short Arab man who ran into the road and fell. The other individual was a tall, thin, dark-complected black man who chased the Arab man and dragged him back to the corner where the two men argued some more. The tall man was wearing dark clothing and a skull cap. She last saw the two men when they began running toward her car. She sped

4

away and could not identify anyone at trial. *See id.* at pp. 170-86 (ECF No. 27-8, PageID.623-27).

Anne Disarno and her husband James also passed the intersection of Packard and Platt Roads about 6:00 a.m. on September 3, 2004. Anne was the passenger in their vehicle, and she saw someone leaning over a person who was lying in the road. The crouched person was an African American male who was wearing a baggie white T-shirt and dark pants. It looked like he was trying to lift the person who was lying down. As Anne turned to tell her husband what she had seen, her husband made a sharp turn and hit a small vehicle that had run the red light. The vehicle that they hit went over the curb and hit a brick abutment. After someone ran past her car, she saw an armed man standing between the pumps at the gas station and the abutment. He was the same person that she had seen leaning over the man in the road. He waved his gun back and forth and fired into the other car. Then a black Lincoln drove through the gas station and went north on Platt Road. Anne did not see anyone get in that car because her head was down at the time, and at trial, she could not identify the African American male that she saw at the intersection. *See id.* at pp. 192-214 (ECF No. 27-8, PageID.628-34).

James Disarno described the gunman as an African American male who was slender, about 5'9" to 5'10" tall, and possibly in his twenties. The man was wearing baggie blue jeans, a baggie white T-shirt, and a black nylon thing wrapped

around his head. The gunman swung a handgun back and forth, fired the gun into a

Toyota, and then headed north off the property in a big black Ford or Lincoln. *See*

*id*. at pp. 215-227 (ECF No. 27-8, PageID.634-37).

Christopher Arcure was the only eyewitness to identify Petitioner at trial. He

approached the intersection of Packard and Platt Roads about 5:55 a.m. on

September 3, 2004, and watched as two men ran toward him. The first man was

waving his hands. The second man was wearing dark-colored baggie jeans or

shorts, a white T-shirt, and a do-rag or hat on backwards; he was tall, slender, and

dark skinned, and he was running close behind the first man. The second man

pointed a gun at the first man and fired. Arcure accelerated through the

intersection, and when he looked in his rear-view mirror, he saw the other man on

the ground. Although he did not pick Petitioner out of a photo array, he did identify

him at the preliminary examination and at trial. *See id*. at pp. 228-67 (ECF No. 27-

8, PageID.637-47).

Pastor Thomas Humphreys passed through the Packard and Platt intersection

about 6:00 a.m. on September 3 and stopped to assist some people who appeared to

have been in an accident. A dark complected male wearing a T-shirt and wrap

around his head walked away from the gas station and towards Humphreys' car.

After the man raised his arm and pointed it at Humphreys, the front of his car

exploded. Humphreys then drove to his church, called 911, and noticed a bullet hole in the front of his car. *See id*. at pp. 268-77 (ECF No. 27-8, PageID.647-50).

Allan Cook worked in the area, and he saw the gas station clerk's Lincoln speed away from the BP station without stopping to pick up anybody. *See id*. at pp. 278-93 (ECF No. 27-8, PageID.650-54). Hesham Abed, the manager of the BP Amoco station at Packard and Platt Roads, testified that $1,069 was missing from the cash register after the incident. *See id*. at pp. 313-14 (ECF No. 27-8, PageID.659).

On same day as the incident in Ann Arbor, a fire investigator named William France investigated a burned Lincoln Town car, which was found near 3778 Garland in Detroit shortly before 8:00 a.m. Mr. France thought that arson was involved because there was an accelerant inside the vehicle and there was no damage to the ignition or the windows. *See* 6/15/05 Trial Tr. at pp. 5-12 (ECF No. 27-9, PageID.664-66).

Ahmed Nagi and Abbas Askar were working at the Marathon gas station at Grand River Avenue and Wyoming Street on September 3, 2004. About 7:00 a.m. that day, a man with a gun came into the convenience store at the gas station and stated that he wanted the safe. The man was tall, in his twenties, light or medium brown complected, and wearing blue jeans and a white shirt with a little red mark on it. He walked with Nagi to the cashier area and threatened to shoot Nagi if

7

Askar did not open the door. Askar opened the door, but because he and Nagi were not authorized to open the safe, they carried the safe to the gunman's car. The gunman then walked Nagi and Askar back to the gas station and told them to thank him for letting them live and not killing them. Both Nagi and Askar identified Petitioner as the gunman in a photo array before trial and in person during Petitioner's trial. *See id.* at pp. 13-29 (ECF No. 27-9, PageID.666-70) (Ahmed Nagi's testimony); *id.* at pp. 30-46 (ECF No. 27-9, PageID.670-74 (Abbas Askar's testimony).

Detective David Monroe was the officer in charge of Petitioner's criminal case. He explained to the jury how the investigation of the case progressed. He also described his interrogation of Petitioner at a detention center in New Mexico on September 22, 2004. According to Detective Monroe, Petitioner initially admitted during the interrogation that he committed the robbery in Detroit, but he denied any involvement in the Ann Arbor robbery. Later in the interview, Petitioner said that his "homie" had been with him during the incident in Ann Arbor, that the gas station clerk was not listening to them or doing what he was told to do, and that he and his "homie" left the area in the victim's car. Ultimately, Petitioner admitted that: he had taken money from the store and chased the clerk; there was a struggle over the car keys, and the gun discharged; and he fled in the victim's car, but he did not mean to kill the clerk. Petitioner also informed Detective Monroe that he

had arranged to have someone burn the car. But Detective Monroe knew before the interview that the car was found near the home of Phillip Reed, who was Petitioner's close friend. There was no fingerprint evidence, fiber evidence, shoe prints, or DNA linking Petitioner to the crimes. *See id*. at pp. 63-152, 167-207 (ECF No. 27-9, PageID.678-701, 704-14); *see also* pp. 207-34 (ECF No. 27-9, PageID.714-21) (Detective Greg Jones' testimony about the lack of physical evidence linking Petitioner to the crimes).

Dr. Bader Cassin testified that the victim died from a gunshot wound to the head and that the manner of death was homicide. *See id*. at p.165 (ECF No. 27-9, PageID.704).

The prosecution's final witness was Dr. Jill Vollbrecht, who drove past the intersection of Packard and Platt Roads about 6:00 a.m. on September 3, 2004. She saw someone lying in the street, and a man with a gun crouching near the body. The crouching man was tall, dark complected, and dressed in a long white shirt and dark pants. Dr. Vollbrecht intentionally went through the red light at the intersection to escape the scene, but she was broadsided by another vehicle, and her vehicle came to a stop near a retaining wall outside the BP gas station. She heard two gunshots at some point, but she was unable to identify the person with the gun. *See* 6/20/05 Trial Tr. at pp. 7-21 (ECF No. 27-10, PageID.724-27).

Petitioner was the only defense witness. He testified that between August 31 and September 2, he and his friend Phillip Reed had discussed doing a "snatch and grab" robbery at the BP gas station at Packard and Platt Roads. He (Petitioner), however, did not want to do the robbery, and on the morning of September 3, 2004, he did not expect anything to happen at the BP station, because he thought he could talk Reed out of doing the robbery. Although Reed called Petitioner while he was in a cab on the way to the gas station, he did not see Reed at the gas station when he arrived there. He did hear gunshots and a car crash, and as he was walking toward Platt Road, a car approached him, and he heard Reed tell him to get in the car. Reed then explained to him that the store clerk had thrown something at him and that he chased the clerk and shot him in the head. Reed also said that somebody would end up dead if Petitioner said anything about the incident.

Continuing, Petitioner testified that he dropped Reed off when they arrived in Detroit and that he (Petitioner) then committed the Marathon robbery by himself. He went to Reed's home after the Marathon robbery, and later took a bus to New Mexico.

Petitioner denied committing the crimes for which he was on trial. His defense was that it was a classic case of misidentification and that Reed had committed the crimes in Ann Arbor. He explained that he did not tell the detectives that Reed committed the crimes because he was loyal to Reed and he feared that

10

Reed would hurt his family if he implicated Reed. At trial, he no longer feared what Reed might do to his family because Reed was in prison. *See id*. at pp. 29-153 (ECF No. 27-10, PageID.729-60).

## II.  The Procedural History

On June 23, 2005, the jury acquitted Petitioner of the assault charges, but found him guilty of felony murder, armed robbery, carjacking, felon in possession of a firearm, and felony firearm. *See* 6/23/05 Trial Tr. at pp. 3-4 (ECF No. 27-12, PageID.810-11).  On July 18, 2005, the trial court sentenced Petitioner to two years in prison for the felony-firearm conviction, to be followed by concurrent terms of life imprisonment without the possibility of parole for the murder, 25 to 50 years in prison for the armed robbery, 35 to 60 sixty years for the carjacking, and 3 to 7½ years for being a felon in possession of a firearm. *See* 7/18/05 Sentencing Tr. at p. 21 (ECF No. 27-13, PageID.838); Judgment of Sentence (ECF No. 27-14, PageID.1037-38).

Petitioner raised his first four habeas claims in an appeal of right. The Michigan Court of Appeals rejected the claims and affirmed Petitioner's convictions in an unpublished decision. *See People v. Horton*, No. 264604, 2007 WL 127825 (Mich. Ct. App. Jan. 18, 2007). Petitioner raised the same claims in the Michigan Supreme Court, but on May 30, 2007, the Michigan Supreme Court

denied leave to appeal because it was not persuaded to review the issues. *See People v. Horton*, 478 Mich. 871 (2007).

In 2008, Petitioner filed his initial habeas corpus petition (ECF No. 1) and a motion to stay the proceedings (ECF No. 2). In his habeas petition he claimed that: (1) the trial court erred when it admitted evidence of his custodial admissions to the police because his admissions were taken in violation of his right to remain silent and his right to counsel; (2) his statement to the police also was involuntary; (3) the trial court erroneously allowed the prosecution to admit evidence of another "bad act"; and (4) the trial court should have ordered a mistrial *sua sponte* after items that had not been admitted in evidence were given to the jury. *See* Pet. (ECF No. 1, PageID.4-9).

In his motion for a stay, Petitioner asked the Court to hold his case in abeyance while he returned to the state courts and exhausted state remedies for three additional claims regarding his trial attorney and his statement to the police. *See* Mot. to Stay Proceedings (ECF No. 2, PageID.16). On July 28, 2008, the Court granted Petitioner's motion for a stay and administratively closed this case. *See* Op. and Order (ECF No. 3).

In 2010, Petitioner filed a motion for relief from judgment in the state trial court. He raised five claims about trial counsel, the sufficiency of the evidence at trial, and the corpus delicti rule. *See* Mot. for Relief from J. (ECF No. 27-16.) The

state trial court found no merit in Petitioner's claims and denied his motion for

relief from judgment in a reasoned opinion. *See People v. Horton*, No. 04-1501 FC

(Washtenaw Cnty. Cir. Ct. June 17, 2010); (ECF No. 27-17).

In 2015 Petitioner filed another habeas petition that raised his initial four

claims. *See* Pet. (ECF No. 12, PageID.72-73). He also filed a motion in which he

explained that he had been unsuccessful in exhausting state remedies for three new

claims and that he wanted to proceed with only his initial four claims. *See* Mot. to

Lift Stay (ECF No. 13, PageID.134-35).

Petitioner subsequently asked the Court to disregard his motion to lift the

stay because he wanted to raise a new claim of actual innocence in the state courts.

*See* Mot. to Disregard Previously Filed Mot. to Lift Stay (ECF No. 16). In an order

dated February 10, 2016, the Court denied as moot Petitioner's motion to lift the

stay, granted the motion to disregard the motion to lift the stay, and stated that it

would continue to hold Petitioner's case in abeyance. *See* Order (ECF No. 17).

Petitioner then returned to the state trial court where he sought relief from

the court's judgment on the basis that he was actually innocent. *See* Brief in

Support of Defendant's Mot. for Relief from J. (ECF No. 27-18). On September

26, 2016, the trial court denied Petitioner's motion because: (i) the evidence in

question was not newly discovered, (ii) it probably would not cause a different

result, and (iii) Petitioner failed to show why the evidence could not have been

discovered sooner, using reasonable diligence. *See People v. Horton*, No. 04-1501-FC (Washtenaw Cnty. Cir. Ct. Sept. 26, 2016); (ECF No. 27-19).

Petitioner appealed the trial court's decision without success. The Michigan Court of Appeals dismissed his appeal under Michigan Court Rule 6.502(G), which prohibits a defendant from appealing the denial of a successive motion for relief from judgment. *See People v. Horton*, No. 337639 (Mich. Ct. App. May 10, 2017); (ECF No. 27-20, PageID.1239). On May 29, 2018, the Michigan Supreme Court denied leave to appeal because Petitioner's motion for relief from judgment was prohibited by Michigan Court Rule 6.502(G). *See People v. Horton*, 501 Mich. 1080 (2018).

On August 28, 2018, Petitioner filed an amended petition for the writ of habeas corpus, *see* ECF No. 21, and a motion to lift the stay, *see* ECF No. 19. The Court granted Petitioner's motion to lift the stay, directed the Clerk of Court to re-open this case, and ordered the State to file an answer to the amended petition. *See* Op. and Order (ECF No. 22). The State subsequently filed its answer in opposition to the amended petition and the state-court record (ECF Nos. 26 & 27), and Petitioner filed a reply (ECF No. 28).

Petitioner later moved for an order directing the State to furnish the police report in his criminal case. *See* Mot. for Order (ECF No. 30). After the Court granted Petitioner's motion, *see* Op. and Order (ECF No. 31), the State filed the

police report and provided a copy to Petitioner, *see* Notice of Filing Supplemental Rule 5 Materials (ECF No. 35).

Finally, on December 13, 2021, Petitioner filed another motion for a stay. The motion is based on information supposedly gleaned from the complete police report that the State sent to Petitioner. *See* Mot. Requesting Stay (ECF No. 42).

### III.  The Motion for a Stay (ECF No. 42)

Petitioner purports to have newly discovered evidence from the complete police report that eyewitness Christopher Arcure made three statements about the crime and that the state prosecutor failed to disclose all three statements. Petitioner also alleges that the pretrial identification procedure was suggestive, and that appellate counsel was ineffective for failing to raise these issues during the appeal of right. Petitioner wants the Court to stay his case while he exhausts state remedies for these four claims.

In *Rhines v. Weber,* 544 U.S. 269 (2005), the Supreme Court approved a "stay and abeyance" procedure, which allows a district court to stay a habeas case and hold the habeas petition in abeyance while the petitioner returns to state court to pursue state remedies for previously unexhausted claims. *See id*. at 275. This stay-and-abeyance procedure, however, is available only in "limited circumstances," such as when "there was good cause for the petitioner's failure to exhaust his claims first in state court," the "unexhausted claims are potentially

meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id*. at 277-78.

Petitioner states that he is not engaged in dilatory tactics, and he implies that appellate counsel was "cause" for his failure to raise his claims on direct appeal. But he has failed to show that his proposed new claims are potentially meritorious.

The first and second new claims that Petitioner wants to raise in state court allege that eyewitness Christopher Arcure made three conflicting statements to police officers after the Ann Arbor crimes, and that the prosecution withheld the fact that Arcure made three statements, not just one. Petitioner relies on *Brady v. Maryland*, 373 U.S. 83 (1963), to support his claim about the prosecutor.

In *Brady*, the Supreme Court held "that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. A true *Brady* claim has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The complete police report includes the following information about Mr. Arcure's eyewitness accounts: a report dictated by Sergeant Connelly on

16

September 3, 2004 (ECF No. 35-1, PageID.1444-45); Mr. Arcure's written statement dated September 3, 2004 (*id*. at PageID.1541); and a supplemental narrative prepared by Officer Robyn Gillen on September 3, 2004 (*id*. at PageID.1417).  Although Petitioner contends that these accounts conflict with each other, they are fundamentally the same in that Arcure said he saw a black male with a gun chasing a shorter man at the intersection of Packard and Platt at 5:55 a.m. on September 30, 2004. Arcure described the suspect as 5 feet 10 inches, to 6 feet tall, 175 to 200 pounds, dark complected, and wearing a white T-shirt, baggy pants, and a dark hat or do-rag.

One minor difference in the statements is the description of the gun that Arcure allegedly saw the suspect holding. According to Sergeant Connelly's report, Arcure said the gun was dark, whereas in Officer Gillen's report, the gun was described as silver. But the description of the gunman was basically the same in the reports, and it was consistent with the descriptions given by other eyewitnesses.

More importantly, nothing in the statements given by Arcure was exculpatory. Therefore, Petitioner's proposed new claims about Arcure's descriptions of the crime and the prosecutor's alleged failure to disclose all three statements lack merit.

Petitioner's third proposed new claim alleges that the trial court failed to consider whether the pretrial identification was suggestive. The record indicates that Arcure first identified Petitioner at the preliminary examination where Petitioner apparently was dressed in orange jail clothes. *See* 11/23/04 Prelim. Examination at pp. 92-93 (ECF No. 27-2, PageID.328). Petitioner, however, challenged Arcure's identification of Petitioner in a pretrial motion to suppress the identification. The trial court held a hearing on the motion and denied it on the basis that the pretrial procedure was not unduly suggestive. *See* 6/6/05 Motions Hr'g Tr. at pp. 3-15 (ECF No. 27-6, PageID.498-510).

Although Petitioner did not exhaust state remedies for his challenge to the pretrial identification by raising the claim in the State's appellate courts, additional attempts to exhaust state remedies likely would be futile. The preliminary examination may have been a suggestive setting for making an identification for the first time, but identification evidence generally is admissible if the indicia of reliability outweigh the corrupting effect of suggestive circumstances. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012).

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *see also Williams v. Bauman*, 759 F.3d 630, 639 (6th Cir. 2014).

The length of time between the crime and the confrontation at the preliminary examination was almost twelve weeks – from September 3, 2004, to November 23, 2004. However, Arcure observed Petitioner from a short distance of several feet during the criminal incident, he appears to have been focused on Petitioner at the time, his description of the gunman matched that of the other eyewitnesses, and he seemed certain of his identification at the preliminary examination.

Arcure's identification of Petitioner had indicia of reliability, despite the suggestiveness of the pretrial identification procedure. Therefore, another challenge to the pretrial identification in all probability would be unsuccessful. And because Petitioner's *Brady* and prosecutorial-misconduct claims also lack merit, appellate counsel was not ineffective for failing to raise Petitioner's proposed new claims on direct appeal.

None of Petitioner's proposed new claims are potentially meritorious.  The Court, therefore, denies Petitioner's motion for a stay. The Court proceeds to adjudicate his initial four claims, plus his actual-innocence claim, using the following standard of review.

## IV.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

requires prisoners who challenge "a matter 'adjudicated on the merits in State

court' to show that the relevant state court 'decision' (1) 'was contrary to, or

involved an unreasonable application of, clearly established Federal law,' or (2)

'was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191

(2018) (quoting 28 U.S.C. § 2254(d)). The Supreme Court has explained that

> a state court decision is "contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."

*Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor,* 529 U.S.

362, 405-06 (2000)) (alterations added).

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.,* at 413, 120 S.Ct. 1495. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id.,* at 410, 412, 120 S.Ct. 1495. The state court's application of clearly established law must be objectively unreasonable. *Id.* at 409, 120 S.Ct. 1495.

*Id.* at 75.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt[.]'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal and end citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "[o]nly an 'objectively unreasonable' mistake, . . . , one 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement,' slips through the needle's eye of § 2254." *Saulsberry v. Lee*, 937 F.3d 644, 648 (6th Cir.) (quoting *Richter*, 562 U.S. at 103), *cert. denied*, 140 S. Ct. 445 (2019). "That's a 'high bar' to relief, which 'is intentionally difficult to meet.'" *Kendrick v. Parris,* 989 F.3d 459, 469 (6th Cir. 2021) (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015)), *cert. denied*, 142 S. Ct. 483 (2021).

## V.  Discussion

### A.    Petitioner's Admissions to the Police

Petitioner alleges first that the trial court deprived him of his rights under the Fifth and Sixth Amendments when the trial court, over objection, admitted evidence of his custodial admissions to the police. Petitioner alleges that his admissions were taken in violation of his right to remain silent and his right to

21

counsel because the two detectives continued to question him after he expressed his reluctance to deal with the police without the assistance of counsel.

### 1.    The Evidentiary Hearing and the State Courts' Resolution of Petitioner's Claim

#### a.  Detective David Monroe's Testimony

Petitioner moved to suppress his admissions to the police before trial. At a hearing on the motion, Detective Monroe testified that he and Detective Greg Jones went to New Mexico to interview Petitioner after Petitioner's arrest there. The interview began about 9:00 a.m. on September 22, 2004.

After the two detectives introduced themselves and asked Petitioner how he was being treated, they told him that his sister had informed them that he had taken responsibility for a robbery at a Marathon gas station in Detroit. Detective Monroe then informed Petitioner that they like to get both sides of a story and that they would like to get his version of what happened. Petitioner responded that he had done the robbery in Detroit. Detective Monroe then stopped Petitioner and advised him of his constitutional rights. *See* 6/3/05 Walker Hr'g Tr. at pp. 11-14 (ECF No. 27-5, PageID.449). The advice of rights occurred nine or ten minutes after the detectives' first contact with Petitioner. *See id*. at pp. 87-88 (ECF No. 27-5, PageID.468). Petitioner claimed to understand his rights, and he stated that he wanted to speak with the officers. *See id*. at p. 17 (ECF No. 27-5, PageID.450).

The first topic of conversation following the advice of rights was whether money had been an issue. Although Detective Monroe posed this question to Petitioner without referring specifically to either the Detroit or Ann Arbor robberies, Petitioner stated that he had not murdered anyone, and he expressed concern about spending the rest of his life in prison for murder. *See id*. Petitioner then indicated that he had spoken with his sister on the previous day and that his sister was trying to find a good attorney for him. *See id*. at p. 19 (ECF No. 27-5, PageID.451).

Petitioner continued to maintain that he had not committed a murder, but when Detective Monroe asked Petitioner who did commit the murder, Petitioner stated that he did not want to provide that information until he had spoken to his attorney. *See id*. at p. 21 (ECF No. 27-5, PageID.451). Similarly, when Detective Monroe asked Petitioner how he happened to take possession of the victim's car, Petitioner stated that he did not want to provide that information until he had an attorney present. *See id*. at p. 23 (ECF No. 27-5, PageID.452).

The interview continued, and Petitioner eventually admitted that he had been at the gas station in Ann Arbor. He also tried to negotiate a sentence with the detectives. *See id*. at pp. 26-27, 31-33 (ECF No. 27-5, PageID.452-54). Petitioner stated that he had not planned on talking to the detectives. He also stated that, if he had an attorney there, the attorney would tell him not to talk to the detectives. He

then said, "But I like you guys." *Id*. at p. 34 (ECF No. 27-5, PageID.454).

Petitioner did not ask to have an attorney present, and Detective Monroe

interpreted Petitioner's remark to mean that he was willing to continue talking. *See*

*id*. at pp. 34-35 (ECF No. 27-5, PageID.454-55).

Petitioner subsequently said that he would tell the detectives everything if

they would get him a cigarette. Detective Jones left to get a cigarette and learned

from the staff at the detention facility that it was a no-smoking facility. Jones was

told, however, that he and Detective Monroe could take Petitioner to a different

facility where he could smoke. So, Detective Monroe promised Petitioner that he

would get a cigarette for Petitioner by the end of the day, and Petitioner agreed to

continue speaking with the officers. *See id.* at pp.35-36, 135 (ECF No. 27-5,

PageID.455, 480).

Petitioner subsequently was permitted to use the bathroom, and he agreed to

continue speaking with the officers after he returned from the restroom. *See id*. at

pp. 44-45 (ECF No. 27-5, PageID.457). At one point, Petitioner told the officers

that was enough questions for the time being. Detective Monroe then told

Petitioner that they would take a break, give Petitioner time for lunch, and try to

find a facility where he could smoke. When Detective Jones asked Petitioner how

they were treating him, Petitioner said the officers were alright. By then, it was

about noon. *See id*. at pp. 46-47 (ECF No. 27-5, PageID.457-58).

The detectives' next contact with Petitioner was approximately 4:00 p.m. that day when they took him to a facility where he could smoke. During the ride there, Petitioner was permitted to smoke, and when they arrived at the facility at approximately 4:30 p.m., he was given a ham dinner. *See id*. at pp. 48-50 (ECF No. 27-5, PageID.458).

Detective Monroe did not re-read Petitioner's constitutional rights to him before interviewing Petitioner that afternoon. *See id*. at p. 126 (ECF No. 27-5, PageID.477). The interview continued with discussions on a variety of topics such as the armed robbery charge, Petitioner's "homie," possible fingerprints at the crime scene, the gun used during the incident, and whether the detectives thought Petitioner had killed the gas station clerk in Ann Arbor. *See id*. at pp. 50-55 (ECF No. 27-5, PageID.458-60). Petitioner said that a very good lawyer would know loopholes and "the ins and outs" and would be able to beat the charges, but he repeated that he did not murder anyone, and he once again asked about a possible sentence. *See id*. at pp. 55-57 (ECF No. 27-5, PageID.460).

About 6:00 or 6:15 p.m., Petitioner talked about getting his sister out of the neighborhood and about the penalty for the crimes. Then he said that he wanted to talk to his attorney about specifics. He also said that he had not told the officers all lies and that he would have to see what an attorney could "simmer up." *See id*. at pp. 58-59 (ECF No. 27-5, PageID.460-61).

Petitioner subsequently asked to use a telephone to call a former girlfriend. After making the call, Petitioner initially refused to answer Detective Jones' question as to whether he had shot the clerk, but he subsequently admitted to taking a shot at the clerk. *See id.* at p. 60, 63 (ECF No. 27-5, PageID.461-62).

The interview concluded about 7:30 p.m. *See id.* at p. 67 (ECF No. 27-5, PageID.463). There was no hostility at any time during the interview, and Petitioner appeared somewhat remorseful at the conclusion of the interview. *See id.* at p. 68 (ECF No. 27-5, PageID.463). The interviews were low-key, friendly, and somewhat informal. There was no yelling, shouting, slamming of books on the table, or hostility. *See id.* at pp. 15, 68 (ECF No. 27-5, PageID.450, 463).

### b.  Petitioner's Testimony

Petitioner testified at the evidentiary hearing that he was arrested about 11:00 p.m. on September 20 and that his first interview with the detectives occurred about 9:00 a.m. on September 22. *See id.* at p. 138 (ECF No. 27-5, PageID.480). He claimed that he was not advised of his constitutional rights until twenty or twenty-five minutes after he entered the room and that he asked for an attorney before he was advised of his constitutional rights. *See id.* at pp. 140-41 (ECF No. 27-5, PageID.481).

Petitioner testified that he informed Detective Monroe more than five times that he wanted an attorney. *See id.* at p. 142 (ECF No. 27-5, PageID.481).

Petitioner also testified that Detective Monroe did not re-read his rights to him after the first time, and that he had not wanted to speak with the detectives without having an attorney present. *See id*. at pp. 143-44 (ECF No. 27-5, PageID.482). He admitted, however, that he did not tell Monroe that he did not want to speak to him. *See id*. at p. 142 (ECF No. 27-5, PageID.481).

When asked on cross-examination whether he thought that Detective Monroe had lied, Petitioner responded, "No," and that Monroe had merely messed up his words. *See id*. at p. 145 (ECF No. 27-5, PageID.482). And when asked why he would talk to people that he did not want to talk to, he testified that he had felt he had to talk because he was "cornered in" and could not go anywhere. *See id*. at p. 152 (ECF No. 27-5, PageID.484). But he admitted that he was aware of his right not to talk to the officers if he did not want to speak with them. *See id*. at p. 154 (ECF No. 27-5, PageID.484).

### c. Detective Greg Jones' Testimony

Detective Jones testified as a rebuttal witness for the State. He corroborated Detective Monroe's testimony that Petitioner admitted to doing the Detroit robbery before his constitutional rights were read to him. Detective Jones also testified that Detective Monroe had stopped Petitioner from saying anything more after Petitioner admitted the Detroit robbery and that Monroe had then informed

Petitioner of his constitutional rights. *See id*. at pp. 159-60 (ECF No. 27-5, PageID.486).

Detective Jones described the interviews as "very down to earth" and "quite amicable." *See id*. at pp. 160-61 (ECF No. 27-5, PageID.486). Of particular significance was Detective Jones' testimony that Petitioner never stated during either the morning session or the afternoon session that he wanted all questioning to cease, that he did not want to talk to the detectives, or that he wanted a lawyer present. *See id*. at pp. 161-62 (ECF No. 27-5, PageID.486). Petitioner did say that he would rather not talk or provide certain information until after he spoke with his attorney. *See id.* at 162 (ECF No. 27-5, PageID.486). But the two officers steered away from those questions when that happened. *See id*. at pp. 163-66 (ECF No. 27-5, PageID.487).

### d. Closing Arguments and the Trial Court's Ruling

During closing arguments, the prosecutor maintained that Petitioner was not being truthful and that Petitioner had not made a clear request to have questioning cease. *See id*. at pp. 168-69, 172 (ECF No. 27-5, PageID.488-489). Defense counsel, on the other hand, argued that Petitioner made a clear, unequivocal request for an attorney and that the detectives should have stopped speaking to Petitioner at that time. *See id*. at pp. 187-88 (ECF No. 27-5, PageID.493).

The trial court made the following findings of fact before ruling on
Petitioner's motion: the interviews were cordial, and there was no hostility
between the officers and Petitioner; Petitioner did not invoke his right to counsel
before his constitutional rights were read to him; he spontaneously made his
statement about the Marathon gas station robbery in Detroit after introductions and
before any questioning occurred; if he had been concerned about having an
attorney before any questioning occurred, he would not have volunteered any
incriminating statements at the time; all three witnesses testified consistently that
Petitioner invoked his right to a lawyer with regard to certain questions regarding
the identity of the murderer and how he came into possession of the victim's
automobile; and the officers did not pursue that line of questioning after Petitioner
stated that he would not answer those questions without an attorney present. *See id*.
at pp. 193-96 (ECF No. 27-5, PageID.494-95). The trial court concluded that
Petitioner was sufficiently informed of his constitutional rights, that he understood
his rights, and that he knowingly waived his rights before making his statements.
*See id*. at pp. 196-97 (ECF No. 27-5, PageID.495).[2]

---

[2] To the extent the trial court gave greater credit to the detectives' testimony than
to Petitioner's testimony, the state court's credibility determination is entitled to
deference. *See Miller v. Fenton*, 474 U.S. 104, 114 (1985) ("When . . . the issue
involves the credibility of witnesses and therefore turns largely on an evaluation of
demeanor, there are compelling and familiar justifications for leaving the process
of applying law to fact to the trial court and according its determinations
presumptive weight."); *Wesson v. Shoop*, 17 F.4th 700, 705 (2021) (stating that,

### e.  The Michigan Court of Appeals' Decision

On direct appeal, the Michigan Court of Appeals analyzed Petitioner's

claims on the merits and disagreed with Petitioner's arguments. The Court of

Appeals stated that the trial court's factual findings were not clearly erroneous. The

Court of Appeals then looked to the rest of the record and noted that:

> defendant's references to an attorney were either in passing, such as
> references about how a good attorney would get him off or would tell
> him not to answer questions and how his sister was going to get him an
> attorney, or they were limited to invocations of an attorney before
> defendant would answer specific questions. And when defendant
> indicated his refusal to answer a specific question without an attorney,
> the detectives ceased questioning defendant on that particular question,
> never bringing up that topic again unless defendant brought it up first.

*Horton*, 2007 WL 127825, at *2.

The Court of Appeals stated that, under state law, "the police are allowed to

continue questioning in such cases, so long as they avoid the topics for which

defendant had invoked a limited right of counsel." *Id*. The Court of Appeals also

correctly noted that, under *Edwards v. Arizona,* 451 U.S. 477, 484-485 (1981), the

---

"[i]n a federal habeas proceeding, state-court credibility determinations are
accorded considerable deference given 'the respect due state courts in our federal
system,' and we presume them 'correct absent clear and convincing evidence to the
contrary'") (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 339-40 (2003), and citing
*Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

"police may question [a] defendant about a previously foreclosed subject where the defendant himself initiates it." *Id*. The Court of Appeals went on to say that,

> when detectives asked defendant if he was the shooter in the Ann Arbor robbery, this was not an improper broach of a subject defendant had requested an attorney for, because he claimed a third party had done the shooting and the question he specifically refused to answer sought the third party's name, not whether he was the shooter.

*Id*.

The Court of Appeals found "nothing improper about the continuing interrogation of defendant by police on issues other than those specific questions defendant said he would not answer without an attorney." *Id.* The Court of Appeals concluded that Petitioner's Fifth Amendment right not to incriminate himself was not violated and that the trial court properly declined to suppress Petitioner's admissions to police on that basis. *Id*.

## 2.    Clearly Established Federal Law

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. "To give force to the Constitution's protection against compelled self-incrimination, the [Supreme] Court established in *Miranda* [*v. Arizona*, 384 U.S. 436 (1966),] 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" *Florida v. Powell*, 559 U.S. 50, 59

31

(2010) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989)). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.

A suspect who "expresse[s] his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85. But to foreclose further questioning, a "suspect must unambiguously request counsel" in such a way that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [the Supreme Court's] precedents do not require the cessation of questioning." *Id*. (emphasis in original).

Furthermore, "[n]othing in [the Supreme Court's] decisions . . . or in the rationale of *Miranda*, requires authorities to ignore the tenor or sense of a defendant's response to these warnings." *Connecticut v. Barrett*, 479 U.S. 523, 528

(1987). Context matters, *Wesson*, 17 F.4th at 706, and limited requests for counsel accompanied by affirmative announcements of a willingness to speak with the authorities is consistent with the Fifth Amendment, *Barrett*, 479 U.S. at 529.

Stated differently, not all invocations of the right to counsel reflect a desire to deal with the police only through counsel. *United States v. Rought*, 11 F.4th 178, 187 (2021). A suspect can limit his or her invocation of counsel to a topic or subject matter. *Id*. at 188. When that occurs, the police must cease interrogating the suspect on topics covered by the invocation or any topics that the police should know are reasonably likely to elicit an incriminating response from the suspect on the covered topic. *Id*. at 189-90. They may continue to interrogate the suspect on matters outside the scope of a limited invocation, *id*. at 189, and if the suspect later initiates discussion of the covered topics without prompting from law enforcement officers, interrogation can resume on those topics, *id.* at 190.

### 3.    Application of the Law

The record before the Court establishes that Petitioner was advised of his constitutional rights. Although Detective Monroe did not immediately inform Petitioner of his rights, he apparently did so within ten minutes of introducing himself and explaining why he and Detective Jones came to see Petitioner. Petitioner made an admission about the Detroit robbery, but that was before Detective Monroe had a chance to finish his introductory remarks and advise

Petitioner of his constitutional rights. And when Petitioner subsequently was advised of his constitutional rights, he indicated that he understood his rights and that he was willing to speak with the detectives.

During the interviews that followed, Petitioner never stated that he wanted all questioning to cease, that he did not want to speak with the detectives, or that he wanted a lawyer to be present. *See* 6/3/05 Walker Hr'g Tr. at p. 161 (ECF No. 27-5, PageID.486) (Detective Greg Jones' testimony). Petitioner did make some references to an attorney, but according to Detective Jones, Petitioner said that he would rather not talk about a given topic until a lawyer was present or that he did not want to provide certain information until after he spoke with his attorney. *See id.* at p. 162 (ECF No. 27-5, PageID.486); *see also* pp. 21, 23, 108-11 (ECF No. 27-5, PageID.451-52, 473-74) (Detective Monroe's testimony that Petitioner did not want to tell the detectives who committed the murder or how he came to be in possession of the victim's car until he spoke to his attorney).

A suspect's refusal to answer a question, or a remark that he has nothing to say to the police, are not necessarily unequivocal invocations of the right to counsel or to remain silent. *See Wesson*, 17 F.4th at 706. Petitioner's refusal to answer specific questions before consulting an attorney were limited invocations of the right to counsel and the right to remain silent.

Detective Monroe admitted at the evidentiary hearing that he did return to the topic of the victim's car and who killed the victim after Petitioner refused to discuss those topics without an attorney present. *See* 6/3/05 Walker Hr'g Tr. at pp. 115-17 (ECF No. 27-5, PageID.475). But the detectives' subsequent questions apparently fell within the scope of the topics that Petitioner was willing to discuss. *See id*. at pp. 23-24, 111-12 (ECF No. 27-5, PageID.452, 474).

Petitioner's other comments were made in passing. *See id*. at p. 19 (ECF No. 27-5, PageID.451) (Petitioner's comment that his sister was trying to find a good lawyer for him); *see id*. at p. 34 (ECF No. 27-5, PageID.454 (Petitioner's comments that, if an attorney were present, the attorney would tell him not to speak to the detectives, but that he liked the detectives). Detective Monroe interpreted the latter remark to mean that Petitioner was willing to continue talking without an attorney. *See id*. at pp. 34-35 (ECF No. 27-5, PageID.454-55). The morning session concluded about noon when Petitioner stated, "That's enough questions for now." *See id*. at pp. 46-47 (ECF No. 27-5, PageID.457-58.)

During the afternoon session, Petitioner made additional passing remarks about an attorney. He said that a good lawyer could "beat this" and would know loopholes and the "ins and outs." But then he repeated that he did not murder anyone. *See id*. at p. 55 (ECF No. 27-5, PageID.460). Later, Petitioner said that he wanted to talk to his attorney about specifics, but that was after a discussion on the

penalty for the crimes and getting his sister out of the neighborhood. *See id*. at pp. 58-59 (ECF No. 27-5, PageID.460-61). And when the discussion turned to the question of whether Petitioner was telling the complete truth, Petitioner said that he would have to see what an attorney "could simmer up." *See id.* at p. 59 (ECF No. 27-5, PageID.461).

To summarize, there was no clear and unequivocal request to have an attorney present or to stop all questioning. Petitioner's partial invocation of the right to counsel for specific questions was respected when the detectives turned to other topics. Petitioner waived his right to remain silent and to have counsel present when he demonstrated a willingness to answer subsequent questions on topics not covered by the limited invocation of counsel, knowing that he had a right to stop the questioning. The state appellate court's rejection of Petitioner's claim was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts, and Petitioner is not entitled to relief on his claim.

**B.     The Voluntariness of Petitioner's Admissions to the Police**

Petitioner's second claim alleges that his admissions to the police were involuntary and, therefore, the trial court deprived him of his rights under the Fifth Amendment when the court admitted evidence of his admissions to the police. To support this claim, Petitioner points out that: the detectives interviewed him while

he was detained in New Mexico and then transported him to an empty facility; he was interrogated for three hours in the morning and four hours in the afternoon; there was no signed waiver of his constitutional rights; there is no record of what transpired because the detectives destroyed their notes of the interview; the detectives did not re-read his *Miranda* rights to him before the afternoon interrogation; and he repeatedly mentioned his desire for counsel. Petitioner concludes from these circumstances, that he was impermissibly coerced into waiving his rights and into making statements to the police without counsel.

The Michigan Court of Appeals determined on review of this issue that there was nothing in the record to suggest Petitioner's statements to the police were involuntary. The Court of Appeals concluded that the trial court did not err when it declined to suppress Petitioner's statements to the police as involuntary.

### 1.    Clearly Established Federal Law

The Supreme Court has stated that, to be admissible, confessions that result from a police interrogation:

> must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * * A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.

*Bram v. United States*, 168 U.S. 532, 542-43 (1897) (quoting 3 Russ. Crimes (6th

Ed.) 478). The test for voluntariness of a confession is whether:

> the confession [is] the product of an essentially free and unconstrained choice by its maker[.] If it is, if [the suspect] has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). When determining whether a

defendant's will was overborne in a particular case, courts must assess:

> the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (internal and end citations

omitted).

## 2.     Application of the Law

The record indicates that Petitioner was twenty-one years old when

Detectives Monroe and Jones interrogated him, *see* 6/15/05 Trial Tr. at p. 173

(ECF No. 27-9, PageID.706), and there was no hostility or show of violence during

the interrogation. Officer Monroe described Petitioner as "very intelligent and

philosophical," *see* 6/3/05 Walker Hr'g Tr. at p. 130 (ECF No. 27-5, PageID.478)**,**

38

and the prosecutor described Petitioner as "a charming guy" who "thought he could charm the police." *See id*. at p. 170 (ECF No. 27-5, PageID.488).

Petitioner had some prior experience with the criminal justice system, *see id*. at p. 172 (ECF No. 27-5, PageID.489), and he was advised of his constitutional rights before Detectives Monroe and Jones interrogated him. He was detained for only two nights and one day before he was interrogated, and even though the interrogation was lengthy (six or seven hours), there was a break of about four hours between the morning and afternoon sessions. Petitioner was not deprived of food, sleep, or bathroom breaks. Finally, as the prosecutor pointed out, Petitioner appears to have made a conscious effort not to remain silent and to control the interrogation by providing bits of information and by trying to negotiate a sentence. *See id*. at pp. 170-71, 176 (ECF No. 27-5, PageID.488-90).

Petitioner points out that he did not provide a signed statement or waiver. However, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel . . . is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *see also United States v. Stevens*, 445 F.2d 304, 305 (6th Cir. 1971) (*per curiam* opinion stating that "there is no requirement that *Miranda* rights can be waived only in writing"). While "mere silence is not enough," "[t]hat does not mean that the defendant's silence, coupled with an understanding of his rights and a course of

conduct indicating waiver, may never support a conclusion that a defendant has waived his rights." *Butler*, 441 U.S. at 373. "[I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated," *id*., and in this case, Petitioner agreed to speak with the detectives after he was advised of his rights. Additionally, toward the end of the morning session, he agreed to tell the detectives everything if they gave him a cigarette.

Petitioner also alleges that the detectives did not re-read his constitutional rights to him before the second interview. However, the amount of time between the two interviews was only a few hours, and "courts have generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Andaverde,* 64 F.3d 1305, 1312 (9th Cir. 1995). In fact, several circuit courts "have ruled that re-warning is not required simply because time has elapsed." *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997) (collecting cases). Even a three-day delay between the advice of rights and a subsequent interrogation is acceptable if the suspect was clearly aware of his rights, understood those rights, was questioned by the same police officer who reminded him of his rights, and there is no evidence of coercion or promises or that anything affected the suspect's understanding of his rights. *United States v. White*, 68 F. App'x 535, 538 (6th Cir. 2003).

In the present case, Petitioner indicated that he was aware of his rights and that he understood his rights. He was questioned by the same two detectives during the morning and afternoon interviews, the atmosphere was amicable, and there is no evidence of any coercion or promises that affected his understanding of his rights.

The Court concludes that Petitioner's admissions to the police were voluntary and that his will was not overborne. The state appellate court's rejection of his claim was objectively reasonable, and Petitioner has no right to relief on his second claim.

## C.     The "Bad Act" Evidence

The third habeas claim alleges that the trial court deprived Petitioner of his rights to due process and a fair trial when the court allowed the prosecution to introduce evidence of the Detroit robbery, which occurred about an hour after the Ann Arbor robbery. Petitioner contends that testimony about the Detroit robbery and a videotape of that robbery which was shown to the jury were unfairly prejudicial. The trial court held a pretrial hearing on this issue and denied defense counsel's motion to exclude the evidence because, in the court's opinion, the probative value of the evidence outweighed the prejudice to Petitioner. *See* 6/6/05 Motions Hr'g Tr. at pp. 15-30, 34 (ECF No. 27-6, PageID.510-25, 529).

41

Defense counsel renewed his objection to the evidence at trial on the basis that the videotape depicting the Detroit robbery hampered his defense and was extremely prejudicial. The prosecutor, however, argued that the Detroit robbery was even more probative than it was before because Petitioner's defense was that someone else committed the Ann Arbor robbery, and yet he went to Detroit and committed the Detroit robbery fifty-two minutes later. The trial court judge stood by her previous decision to deny defense counsel's motion to exclude the evidence. *See* 6/14/05 Trial Tr. at pp. 188-90 (ECF No. 27-8, PageID.627-28).

The Michigan Court of Appeals subsequently discussed Petitioner's claim under state law and concluded that evidence of the Detroit robbery was properly admitted in evidence. Petitioner contends that the state courts erred when addressing this claim.

Even if the state courts misinterpreted the Michigan Rules of Evidence, "such errors are not cognizable on federal habeas review," *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009), because "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). When "conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

In addition, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). "While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), it has not explicitly addressed the issue in constitutional terms." *Id*. at 513. As such, there is no Supreme Court precedent that the state court's decision could be deemed "contrary to" under AEDPA. *Id.*

It is true that a state court's evidentiary error can rise to the level of a federal constitutional claim warranting habeas corpus relief if the error rendered the proceeding fundamentally unfair. *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004). In Petitioner's case, however, admitting the evidence was not fundamentally unfair for reasons given by the Michigan Court of Appeals.

First, the evidence shed light on the identity of the perpetrator of the Ann Arbor robbery. As explained by the Michigan Court of Appeals, Petitioner

> was seen [at the Detroit gas station] within one hour of the first robbery, he was seen wearing clothing matching the same description as the clothing seen worn on the perpetrator of the Ann Arbor robbery, and he was seen there in the car owned by the clerk murdered in the Ann Arbor robbery, all of which shed light on the identity of the perpetrator of the Ann Arbor robbery. Defendant's order to the clerks in the Detroit

station to thank him for letting them live after he robbed the station is also relevant to identity because the request is a type of statement one might expect from someone who just killed a clerk at another gas station for not being as cooperative as they had been.

*Horton*, 2007 WL 127825 at *4.

Second, evidence of the Detroit robbery was relevant. It cast doubt on Petitioner's trial testimony that he did not want to commit the Ann Arbor robbery. Additionally, his comment to the Detroit gas station clerks that they should thank him for letting them live showed that he might be inclined to shoot someone during a robbery.

Third, evidence of the Detroit robbery had probative value, because "[o]ne does not normally find an innocent explanation for a person matching the description of the perpetrator of a carjacking to be in the car stolen less than one hour later at a location about an hour's drive from the robbery." *Id*.

Although the evidence was prejudicial, the trial court instructed Petitioner's jury mid-trial and at the conclusion of the case that they could not conclude from the evidence that Petitioner was a bad person, likely to commit crimes, or guilty of other bad conduct. The court also stated that the jurors could consider the evidence only for purposes of determining whether Petitioner acted purposely with regard to the charged crime, whether he used a plan, system, or characteristic scheme that he had used before or since, and whether he committed the crime for which he was

charged. *See* 6/15/05 Trial Tr. at pp. 47-48 (ECF No. 27-9, PageID.674-75);

6/21/05 Trial Tr. at pp. 24-25 (ECF No. 27-11, PageID.771).

Jurors are presumed to follow a court's instructions to them, *Richardson v.*
*Marsh*, 481 U.S. 200, 211 (1987); *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir.
2001). Therefore, the trial court's instructions -- that the jurors must not conclude
from evidence of other crimes that Petitioner was a bad person or had a propensity
to commit crimes -- served to mitigate any prejudice from the "other act" evidence.

To conclude, Petitioner's claim is not cognizable on habeas review, and even
if it were, it was not fundamentally unfair to admit evidence of the Detroit robbery.
Petitioner has no right to relief on his claim.

**D.      The Trial Court's Failure to Order a Mistrial**

Petitioner's fourth claim alleges that the trial court should have declared a
mistrial when it learned that the deliberating jurors received items that were not
admitted in evidence. Although Petitioner did not move for a mistrial, he maintains
that manifest necessity required the trial court to order a mistrial *sua sponte*.

The Michigan Court of Appeals disagreed with Petitioner and concluded that
there was nothing to support Petitioner's contention that the trial court erred by not
*sua sponte* granting a mistrial. The Court of Appeals also stated that Petitioner
waived review of his claim by expressly stating at trial that he did not want to
move for a mistrial on the issue. *Horton*, 2007 WL 127825, at * 5.

45

A waiver ordinarily is "an intentional relinquishment or abandonment of a known right or privilege," and a determination of whether there has been an intelligent waiver "must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Because waiver extinguishes an error, *United States v. Olano*, 507 U.S. 725, 733 (1993), a court "cannot review the supposed error at all." *United States v. Montgomery*, 998 F.3d 693, 697 (6th Cir. 2021) (citing *Olano*, 507 U.S. at 733, and *United States v. Jackson*, 995 F.3d 476, 484 (6th Cir. 2021)).

About three hours after the jurors began their deliberations in Petitioner's trial, the trial court acknowledged on the record that the jury had been given items that were not admitted as exhibits. The court then questioned the jury foreman in the absence of the other jurors, and the foreman explained that the jurors had been looking for a record of a phone call made during Petitioner's cab ride to the BP gas station on the morning of the crimes. The foreman also stated that the jurors had found some records for Petitioner's phone.

After the jury foreman was sent back to the jury room, the attorneys and the trial court discussed the issue among themselves. They agreed that the trial court would instruct the jurors that: (1) the records they saw were not the complete records, and that the attorneys were stipulating to that; and (2) any incoming phone

calls on his cell phone would not register in the records because it was a prepaid

phone for which there were no records. *See* 6/21/05 Trial Tr. at pp. 150-59 (ECF

No. 27-11, PageID.802-05).

Defense counsel, however, wanted to hear from the juror who first

discovered the unmarked items. That juror then appeared before the trial court and

corroborated what the jury foreman had said. *See id*. at pp. 159-64 (ECF No. 27-

11, PageID.805-06).

The trial subsequently instructed all the deliberating jurors that: (1) they

should not consider any items that were mistakenly given to them and were not

evidence; (2) the phone record that they did see was not a record for the cell phone

Petitioner was using at the time in question; and (3) the attorneys were stipulating

that Petitioner had a prepaid phone on the day of the crime and there were no

records for that cell phone. The court then sent the jurors back to the jury room to

continue their deliberations. *See id*. at pp. 164-66 (ECF No. 27-11, PageID.806).

In the jury's absence, defense counsel stated that he had advised Petitioner

of his right to move for a mistrial, but that Petitioner did not want defense counsel

to make a motion for a mistrial. The trial court then asked Petitioner whether he

understood what defense counsel had said, whether he agreed with defense

counsel, and whether it was true that he did not want the court to consider a motion

for a mistrial. Petitioner answered, "Yes," to all three questions. *See id*. at pp. 166-67 (ECF No. 27-11, PageID.806-07).

It is clear from the record that Petitioner voluntarily and knowingly waived his right to move for a mistrial. The Court, therefore, is not required to address his claim on the merits. *Montgomery*, 998 F.3d at 697-98.

## E.   Actual Innocence

In his fifth and final claim, Petitioner alleges that he is innocent of the crimes for which he was convicted. He points out that several witnesses could only give a general description of the suspect, and the man that he claimed was responsible for the crimes resembled him. To further support his claim, Petitioner alleges that hours before the crime, he was seen with a man named Lydell who resembled the suspect more than him and was dressed like the suspect seen in the video of the Detroit robbery.

Petitioner's attempt to blame "Lydell" for the crimes contradicts his defense at trial that his close friend Phillip Reed committed the crimes. Furthermore, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). "This rule is grounded in the principle that

federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Id*.

In capital cases, the Court may assume that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id*. at 417. But this is not a capital case. Moreover, Petitioner confessed to shooting the victim, and he is not relying on any new evidence that would cast doubt on his confession. Accordingly, the Court declines to grant relief on Petitioner's claim of actual innocence.

## VI. Conclusion

Petitioner's third and fifth claims are not cognizable on habeas review, and he waived review of his fourth claim. Further, the state appellate court's adjudication of Petitioner's first and second claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. The state court's adjudication of Petitioner's first and second claims on the merits also was not so lacking in justification that there was an error beyond any possibility for fairminded disagreement.

Accordingly, the Court **DENIES** the amended habeas corpus petition (ECF No. 21).  The Court also **DENIES** Petitioner's motion for a stay (ECF No. 42).

Petitioner has no automatic right to appeal the Court's denial of his habeas petition. *Miller-El*, 537 U.S. at 327. "Instead, [he] must first seek and obtain a [certificate of appealability]." *Id*. A certificate of appealability may issue "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (punctuation modified, citation omitted).

Reasonable jurists could debate the Court's resolution of Petitioner's first claim regarding the alleged violation of his rights to counsel and to remain silent. The Court, therefore, grants a certificate of appealability on the first habeas claim. The Court declines to grant a certificate of appealability on the remaining claims because reasonable jurists could not debate whether those claims should have been resolved differently, and those claims do not deserve encouragement to proceed further.

The Court also grants Petitioner permission to proceed *in forma pauperis* on appeal if he appeals this decision because he was granted *in forma pauperis* status

in this Court, *see* Order (ECF No. 17), and an appeal could be taken in good faith.

28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3)(A).

      **IT IS SO ORDERED**.

                    s/Paul D. Borman
                    PAUL D. BORMAN
Dated: January 12, 2022        UNITED STATES DISTRICT JUDGE