# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: April 28, 2023

Mr. Eric Jenkins
Mr. John S. Pallas
Office of the Attorney General
of Michigan
P.O. Box 30217
Lansing, MI 48909

Mr. Frank J. Lawrence Jr.
Law Office of Frank J. Lawrence, Jr.
941 Westview Road
Bloomfield Hills, MI 48304

      Re: Case No. 22-1084, *Rason Horton v. Willis Chapman*
           Originating Case No. : 2:08-cv-12798

Dear Counsel,

    The Court issued the enclosed opinion today in this case.

    Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                              Sincerely yours,

                              s/Cathryn Lovely
                              Opinions Deputy

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0202n.06

Case No. 22-1084

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| RASON ANGELO HORTON, | ) | |
| Petitioner - Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| WILLIS CHAPMAN, Acting Warden, | ) ) | |
| Respondent - Appellee. | ) ) ) | OPINION |

FILED
Apr 28, 2023
DEBORAH S. HUNT, Clerk

Before: GIBBONS, THAPAR, and BUSH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. In the aftermath of two robberies, law enforcement officers quickly focused on Rason Horton as a suspect. After Horton was arrested, two detectives went to question Horton in jail. During that questioning, Horton made several references to an attorney, but the detectives did not interpret the comments as a request to consult an attorney and continued the interrogation. Horton's statements were admitted at trial, and he was convicted. Now, Horton seeks relief from his state court conviction under 28 U.S.C. § 2254, arguing that his Fifth Amendment rights were violated during the police questioning. The district court denied Horton's petition, agreeing with the state court that Horton's references to an attorney were vague or only limited invocations of his right to counsel. Horton appeals. Because we agree that the state court decision was not contrary to nor an unreasonable application of clearly established federal law, we affirm.

No. 22-1084, *Horton v. Chapman*

I.

On the morning of September 3, 2004, a robbery occurred at a gas station in Ann Arbor, Michigan. The robber took cash from the register and then demanded the keys to the store clerk's car. The clerk refused to hand over his keys and fled on foot. The robber pursued and ultimately shot and killed the clerk. After shooting the clerk, the robber noticed the presence of several witnesses at the scene, became agitated, and pointed the gun at various cars before firing into one of their windshields. He then took the clerk's keys from his pocket and drove away in the clerk's car.

Within an hour, a second robbery occurred at a gas station in Detroit. There, a man forced two cashiers to carry the store's safe out to his car and then left without further incident.

On September 20, 2004, authorities in New Mexico arrested Rason Horton. Law enforcement believed that Horton was responsible for both Michigan robberies and had taken a Greyhound bus from Detroit to New Mexico the night of the robberies. They also believed that Horton had asked another person to burn the store clerk's car, which had been found, damaged but identifiable, in Detroit shortly after the second robbery.

Detectives David Monroe and Greg Jones of the Ann Arbor Police Department flew to New Mexico to interview Horton the next day. At the outset of the interview, Monroe told Horton that he had spoken with Horton's sister and that she told the detectives that Horton "had taken responsibility for a robbery that happened at the Marathon gas station in Detroit." DE 27-5, Evid. Hr'g Tr., Page ID 449. Monroe also explained that his understanding was that Horton had also "indicated [that] he had not harmed anyone in Ann Arbor." *Id.* The detectives told Horton that they wanted to get his side of the story.

The parties dispute what happened next. Both parties appear to acknowledge that Horton admitted to committing the Detroit robbery. At the state court evidentiary hearing, Monroe testified that he then stopped Horton from continuing and advised him of his *Miranda* rights. Monroe also testified that Horton said that he understood his rights and that he wanted to talk with the detectives. Horton, in contrast, testified that he was not advised of his *Miranda* rights until twenty to twenty-five minutes into the interview and that he asked for an attorney before he was advised of his rights but that the detectives did not acknowledge his request.

Both sides agree, however, that the interview continued. The detectives asked Horton if money had been his motivation, not specifying either robbery, and Horton stated that he had not murdered anyone. Horton commented that he was concerned about spending the rest of his life in prison, apparently referencing the Detroit robbery. Horton then told the detectives that he had spoken to his sister the previous day and that "she was trying to find a good attorney for him." DE 27-5, Evid. Hr'g Tr., Page ID 451. The detectives did not follow up on this comment, and the questioning continued.

After covering other topics, Horton again insisted that he had not harmed anyone in Ann Arbor and that "there was no way he should be convicted of that murder because it was something that he had not done." *Id*. Monroe asked Horton who had committed the murder, and Horton indicated that "he did not want to give . . . that information without—until he had spoke [sic] to his attorney." *Id*. Monroe changed the subject, asking Horton about driving to Detroit after the Ann Arbor robbery and about the car that Horton was using at the time. In response to Monroe asking about the car being burned, Horton claimed that he only knew that the car had been burned because his sister told him. When Monroe pressed Horton about how he had gotten the car, Horton

responded that "he didn't want to tell [the officers] that until he had a lawyer present or an attorney present." *Id.* at 452. Monroe again changed the topic but continued questioning Horton.

In an apparent effort to clarify Horton's story as to the Ann Arbor robbery, Monroe asked Horton if he was claiming that "he had been at the gas station in Ann Arbor but had not harmed or killed anyone." *Id.* at 453–54. Horton responded by stating that he had been present at the Ann Arbor gas station but "for a completely different reason" and that a lot of things had happened in a short time frame. *Id.* at 452–53. Horton repeated his claim that he had not killed anyone. Horton told the detectives that he was not the only person in the gas station during the robbery and that "two other people in addition to the clerk" were there. *Id.* at 454.

At one point, Horton told Monroe and Jones that he had not planned on talking to them and instead had planned on simply staring at them during the interview. He also commented that "if he had an attorney there the attorney would tell him not to talk." *Id.* Monroe testified that Horton then commented, "but I like you guys." *Id.* Horton told the detectives that he would tell them everything if they got him a cigarette. The facility would not allow smoking, however, so the detectives promised to get him a cigarette later that day if he continued to answer their questions. Horton agreed, and the interview continued.

In continued discussion about the Ann Arbor robbery, Horton persisted in his claim that another person, his "homie," was responsible. *Id.* at 455. Although he acknowledged that he was at the gas station and had planned to participate, Horton claimed that he had taken the clerk's car keys off the counter at the beginning of the robbery and then went to sit in the clerk's car. Horton claimed that he was sitting in the car when he saw his homie chasing the clerk and that he did not see the shooting itself but later saw the clerk's body on the street.

Soon thereafter, Horton again asked about having a cigarette, and the detectives reiterated their promise that he could smoke later that day if he would continue speaking with them. After approximately five more minutes of questioning, Horton told the detectives, "that's enough questions for now." *Id.* at 457. The detectives told Horton that they would take a break for lunch and that the detectives would find a place for him to smoke.

Around three and a half hours later, Monroe and Jones drove Horton to another facility where he could smoke and resumed the interview. The detectives did not read Horton's *Miranda* rights to him again at the start of the second session. Horton spoke first, asking "where did we leave off?" *Id.* at 458. After some discussion of the Ann Arbor robbery, Horton proposed a trade wherein he would reveal his homie's identity if the detectives made a sentence agreement with him. The detectives told Horton that they could not make any promises or guarantees.

According to Monroe's state court testimony, Horton brought up a lawyer three other times that day. At one point, Horton commented to the detectives that "a very good lawyer can beat this" and that the lawyer "would know loopholes and that he would know the ins and outs." *Id.* at 460. When discussing his family, Horton told the detectives that he wanted to get his sister out of her neighborhood and that "he wanted to talk, talk to his attorney about specifics." *Id.* Finally, when the detectives pointed out several inconsistencies in Horton's story, Horton remarked that "he'd have to see what an attorney could simmer up" regarding his explanation. *Id.* at 461.

The second portion of Horton's interview ended after approximately three hours. After it concluded, the detectives returned Horton to his facility, where he told them that "this was bothering him" but that "he felt better." *Id.* at 463.

Horton was charged in Michigan state court with felony murder, armed robbery, carjacking, being a felon in possession of a firearm, possession of a firearm during commission of

a felony, and two counts of assault with intent to commit murder. Horton elected to go to trial. Before trial, defense counsel moved to suppress the statements that Horton made to Monroe and Jones during the New Mexico interview. After an evidentiary hearing, the trial court denied Horton's motion, and the statements were admitted into evidence. The jury convicted Horton of all charges except the assault charges. The trial court imposed an aggregate sentence of life in prison.[1]

Horton appealed to the Michigan Court of Appeals, claiming, among other things, that his constitutional rights were violated when his statements were admitted into evidence. The Michigan Court of Appeals affirmed. Horton sought leave to appeal to the Michigan Supreme Court on the same grounds, but his application was denied.[2]

Horton then filed a 28 U.S.C. § 2254 petition in federal court, raising four grounds for relief.[3] At the same time, Horton moved to stay the federal proceedings so that he could exhaust his state court remedies for three additional claims, and the district court granted his motion. Horton then went back to state court, where he unsuccessfully pursued collateral relief for ten years.

---

[1] Horton was sentenced to two years' imprisonment for the felony-firearm conviction, to be followed by concurrent terms of life imprisonment without the possibility of parole for the murder conviction, twenty-five to fifty years' imprisonment for the armed robbery conviction, thirty-five to 60 years' imprisonment for the carjacking conviction, and three to seven-and-a-half years' imprisonment for being a felon in possession of a firearm.

[2] In its denial, the Michigan Supreme Court stated only that it was "not persuaded that the questions presented should be reviewed by [it.]" *See People v. Horton*, 731 N.W.2d 739, 739 (Mich. 2007).

[3] Horton's four claimed grounds for relief were: (1) the trial court erred when it admitted evidence of his custodial admission to the police because his admissions were taken in violation of his right to remain silent and his right to counsel; (2) his statements to the police were involuntary; (3) the trial court erroneously allowed the prosecution to admit evidence of another "bad act," and (4) the trial court should have ordered a mistrial sua sponte after items that had not be admitted into evidence were given to the jury.

No. 22-1084, *Horton v. Chapman*

Horton returned to federal court in August 2018, filing a motion to lift the stay and an amended habeas petition that added an additional claimed ground for relief.[4] The district court granted the motion to lift the stay and re-opened the case. After briefing from both parties, the district court denied Horton's habeas petition but granted a certificate of appealability on his claim that his statements were admitted into evidence in violation of his constitutional rights. Horton timely appealed.[5]

II.

This court reviews a district court's dismissal of a § 2254(d) petition de novo and its factual findings for clear error. *Lovins v. Parker*, 712 F.3d 283, 293 (6th Cir. 2013). Under § 2254(d), the district court "shall not [ ] grant[ ] [a habeas petition] with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . .; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

When the state court denies a petitioner's federal claim, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). This presumption may be overcome "[w]hen the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." *Johnson v. Williams*, 568 U.S. 289, 303 (2013). If the

---

[4] Horton added an actual innocence claim.

[5] Horton also moved to expand the certificate of appealability, but that motion was denied.

- 7 -

No. 22-1084, *Horton v. Chapman*

state court did not adjudicate a petitioner's claim on the merits, this court reviews the claim de novo. *Cone v. Bell*, 556 U.S. 449, 472 (2009).

Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), is a "purposefully demanding standard," *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (en banc), and it requires that state court determinations "be given the benefit of the doubt," *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Here, Horton invokes both §§ 2254(d)(1) and 2254(d)(2), arguing that the Michigan Court of Appeals' decision was contrary to Supreme Court precedent, unreasonably applied Supreme Court precedent, and constituted an unreasonable determination of the facts.

In Horton's view, the statements that he made to Monroe and Jones occurred after he invoked his right to counsel, so their admission into evidence violated his Fifth Amendment[6] rights. Horton argues that the state court misapplied clearly established federal law by "appl[ying] an unduly strict standard of whether statements requesting counsel applied to the specific questions that later incriminated Horton." CA6 R. 13, Appellant Br., at 23–24. In contrast, the state argues that Horton never unequivocally requested to cease all questioning until he consulted an attorney. Instead, Horton told the detectives only that he would not answer specific questions without an attorney, which constituted only a limited invocation of the right to counsel. The state argues that the state court therefore properly applied clearly established federal law, and that Horton should be denied relief.

---

[6] Horton also appears to claim that the admission of his statements violated his Sixth Amendment rights, but he did not brief the issue and therefore forfeited it. *See Peters Broad. Eng'g, Inc. v. 24 Cap., LLC*, 40 F.4th 432, 443 n.6 (6th Cir. 2022).

- 8 -

Case 2:08-cv-13798-PDB-DAS ECF No. 30-2, PageID.1948 Filed 04/28/23 Page 10 of 18
Case: 22-1084 Document: 30-2 Filed: 04/28/2023 Page: 9 (10 of 18)

No. 22-1084, *Horton v. Chapman*

III.

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."[7] U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court held that the right against self-incrimination extends beyond formal legal proceedings to reach even "informal compulsion . . . during in-custody questioning." 384 U.S. 436, 461 (1966). Thus, *Miranda* requires that suspects undergoing custodial interrogation be informed of their right to remain silent and to have an attorney present during questioning. *Id.* at 478–79.

Once a suspect invokes his right to counsel, interrogation can resume only after "counsel has been made available . . . unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). This rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

To determine whether the *Edwards* rule applies, an accused person must have "*actually invoked* his right to counsel." *Davis v. United States*, 512 U.S. 452, 458 (1994) (internal quotation marks and citation omitted) (emphasis in original). This invocation must be "unambiguous[]"to invoke the right and trigger the requirement that the police cease questioning. *Id.* at 459. Thus, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* An ambiguous or equivocal reference to counsel, however, "do[es] not require the cessation of questioning." *Id.*

---

[7] The Supreme Court held that the Fifth Amendment applies to the states through the Fourteenth Amendment in *Malloy v. Hogan*, 378 U.S. 1 (1964).

- 9 -

No. 22-1084, *Horton v. Chapman*

It is possible for a suspect to invoke his or her right to counsel selectively, that is, with respect only to certain aspects of the questioning. In *Michigan v. Mosley*, a defendant refused to answer questions about several robberies, after which a detective ceased interrogating him about them, but the defendant later confessed to an unrelated homicide in a subsequent interrogation. 423 U.S. 96, 104–05 (1975). The Supreme Court held that the defendant's assertion of his right to counsel during the robbery interrogation selectively invoked the right and did not extend to the homicide questioning. *Id.* at 105. Relatedly, in *Connecticut v. Barrett*, a suspect provided an oral confession after saying that "he would not give the police any written statements [without counsel] but had no problem in talking about the incident." 479 U.S. 523, 525 (1987). The Court held that the refusal to provide a written statement was a "limited invocation of the right to counsel" that did not extend to an oral confession. *Id.* at 529–30.

IV.

Horton raised his Fifth Amendment arguments in state court, but the Michigan Court of Appeals rejected Horton's claim with the following reasoning:

> Defendant first argues he was denied his Fifth Amendment right against self-incrimination when the trial court admitted, over his objection, custodial admissions he made to the police. Defendant also argues that the trial court should have suppressed the statements as involuntarily made. We disagree with both contentions.
>
> A trial court's legal conclusions are reviewed de novo. *People v. Medlyn,* 215 Mich. App. 338, 340; 544 N.W.2d 759 (1996). A court's ultimate decision regarding a motion to suppress is also reviewed de novo. *People v. Davis,* 250 Mich. App. 357, 362; 649 N.W.2d 94 (2002). However, the trial court's findings of fact following a suppression hearing will not be disturbed unless they are clearly erroneous. *People v. LoCicero,* 453 Mich. 496, 500; 556 N.W.2d 498 (1996). Factual findings are clearly erroneous where, based on review of the whole record, there is a firm and definite conviction that the trial court made a mistake. *People v. Burrell,* 417 Mich. 439, 449; 339 N.W.2d 403 (1983).
>
> The right against self-incrimination is a right guaranteed by both the United States and Michigan Constitutions. U.S. Const., Am. V; Const. 1963, art 1, § 17. "[A] suspect in police custody must be informed specifically of the suspect's right to

- 10 -

remain silent and to have an attorney present before being questioned." *People v. Kowalski,* 230 Mich. App. 464, 472; 584 N.W.2d 613 (1998). If a suspect requests an attorney, interrogation must cease until an attorney is present. *Id.* But where a defendant makes only an ambiguous or equivocal reference to an attorney, questioning may continue. *People v. Granderson,* 212 Mich. App. 673, 677-678; 538 N.W.2d 471 (1995). And a limited request for counsel, such as a request for counsel for answering a specific question, does not limit police from continuing to interrogate a suspect on other topics. *People v. Adams,* 245 Mich. App. 226, 233-234; 627 N.W.2d 623 (2001).

There were only two witnesses on this issue, and their testimony conflicted with each other. Defendant testified that he unequivocally invoked his right to counsel, and Detective Jones testified that defendant never made such a request. Clearly, the trial court found Jones's testimony on this point credible and did not believe defendant's claim to the contrary. Given the lack of other evidence to corroborate defendant's claim, and the fact that the trial court is entitled to gauge credibility, there is nothing in the record to give this Court a firm and definite conviction that a mistake was made in the trial court's relevant factual findings. Therefore, the trial court's factual findings were not clearly erroneous and will not be disturbed. *Burrell, supra* at 449.

Looking at the rest of the record, it is clear that defendant's references to an attorney were either in passing, such as references about how a good attorney would get him off or would tell him not to answer questions and how his sister was going to get him an attorney, or they were limited to invocations of an attorney before defendant would answer specific questions. And when defendant indicated his refusal to answer a specific question without an attorney, the detectives ceased questioning defendant on that particular question, never bringing up that topic again unless defendant brought it up first. As indicated above, the police are allowed to continue questioning in such cases, so long as they avoid the topics for which defendant had invoked a limited right of counsel, *Adams, supra* at 233-234, and police may question defendant about a previously foreclosed subject where the defendant himself initiates it. *Edwards v. Arizona,* 451 U.S. 477, 484-485; 101 S Ct 1880; 68 L.Ed.2d 378 (1981).

Further, when detectives asked defendant if he was the shooter in the Ann Arbor robbery, this was not an improper broach of a subject defendant had requested an attorney for, because he claimed a third party had done the shooting and the question he specifically refused to answer sought the third party's name, not whether he was the shooter. Thus, there was nothing improper about the continuing interrogation of defendant by police on issues other than those specific questions defendant said he would not answer without an attorney. Therefore, defendant's Fifth Amendment right was not violated and the trial court properly declined to suppress defendant's admissions to police on that basis.

- 11 -

*People v. Horton*, No. 264604, 2007 WL 127825, at *1–2 (Mich. Ct. App. Jan. 18, 2007) (per curiam).

V.

First, Horton argues that the Michigan Court of Appeals did not apply the correct legal standard for evaluating his invocation of his right to counsel so its decision is therefore contrary to clearly established federal law.

A federal court may grant habeas relief under the "contrary to" clause of § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

According to Horton, the state court failed to apply the objective rule from *Davis*, 512 U.S. at 459, that requires a suspect to unambiguously invoke his right to counsel. Horton claims that the state court instead "applied an unduly strict standard of whether statements requesting counsel applied to the specific questions that later incriminated Horton." CA6 R. 13, Appellant Br., at 23–24.

The state court, however, identified and applied the correct legal standard. It first outlined the relevant legal framework, explaining that unambiguous requests for counsel cut off questioning but that equivocal statements do not trigger that requirement. *Horton*, 2007 WL 127825, at *1. It also noted that suspects can make a limited request for counsel, which "does not limit police from continuing to interrogate a suspect on other topics." *Id.* The court then concluded that Horton's references to an attorney were in passing or were limited invocations. *Id.* at *2. Thus, the court held that, because the detectives did not return unprompted to the topics for which Horton invoked his right to counsel, Horton's constitutional rights were not violated. *Id.* This analysis identified

- 12 -

and applied the correct legal standard, and accordingly, the Michigan Court of Appeals' decision was not contrary to clearly established federal law.

VI.

Second, Horton argues that the Michigan Court of Appeals unreasonably applied clearly established federal law.

A federal court may grant habeas relief under the "unreasonable application" clause of § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Williams*, 529 U.S. at 365. "As a condition for obtaining habeas corpus from a federal court, [the petitioner] must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Horton claims that the state court unreasonably applied *Edwards* and *Smith v. Illinois,* 469 U.S. 91 (1984) (per curiam), in which the Supreme Court held that the defendants' Fifth Amendment rights had been violated by continued questioning after they requested counsel.

In *Edwards*, the accused was arrested and taken to the police station for interrogation. 451 U.S. at 478. After some initial questioning, Edwards sought to "make a deal." *Id.* at 479. After being given the phone number of the county attorney, ostensibly to negotiate a deal, Edwards said, "I want an attorney before making a deal." *Id.* The officers ceased their questioning and returned Edwards to jail. *Id.* The officers, however, resumed questioning Edwards the next morning, and during that interrogation, Edwards implicated himself in the crime. *Id.* The Supreme Court held that the second interrogation of Edwards violated his Fifth Amendment rights. *Id.* at 484–85. The Court held "that an accused . . . having expressed his desire to deal with the police

- 13 -

No. 22-1084, *Horton v. Chapman*

only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* The Court further stated that "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Id.* at 485.

In *Smith*, the accused was arrested and taken to an interrogation room for questioning. 469 U.S. at 92. When informed during the reading of his *Miranda* rights that he had a right to consult a lawyer and to have a lawyer present during questioning, Smith responded, "[u]h yeah. I'd like to do that." *Id.* at 93. The officers, however, did not acknowledge this statement, read him the rest of his *Miranda* rights, and proceeded to question Smith. *Id.* Smith ultimately made incriminating statements in response to this questioning. *Id.* at 93–94. In rejecting Smith's challenge to the admission of these statements at trial, the state court determined that Smith's invocation of his right to counsel was ambiguous because he subsequently responded to continued questioning. *Id.* at 97. The Supreme Court, however, held that "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request [for counsel] itself." *Id.* at 100 (emphasis in original).

*Edwards* considered whether an undisputedly unequivocal request for counsel prevents further questioning. And *Smith* considered whether subsequent statements can be used to cast doubt on an initial unambiguous invocation. Both holdings are irrelevant here. In Horton's case the question was whether Horton invoked his right to counsel at all—not whether further questioning transpired after a clear invocation. The Michigan Court of Appeals concluded that Horton did not unequivocally invoke his right to counsel generally but instead made a limited

- 14 -

request for counsel, which prevented further questioning only on specific topics. *Horton*, 2007 WL 127825, at *2. This holding does not implicate *Edwards* and *Smith*.

Further, the state court's interpretation of Horton's references to counsel did not lack justification. The evidence before the state court showed that Horton referenced an attorney at various points in his interview. Many of these references, however, simply noted that he might need an attorney at some point. For example, Horton noted that his sister "was trying to find a good attorney for him." DE 27-5, Evid. Hr'g Tr., Page ID 451. Horton also commented that "if he had an attorney there the attorney would tell him not to talk." *Id.* at 454. Additionally, Horton told the detectives that "a very good lawyer can beat this," the lawyer "would know loopholes and that he would know the ins and outs," and that "he'd have to see what an attorney could simmer up" regarding his inconsistent explanation for his involvement in the robberies. *Id.* at 460–61. Even more obliquely, Horton mentioned that "he wanted to talk, talk to his attorney about specifics" regarding moving his sister out of a problematic neighborhood. *Id.* at 460. These comments did not unambiguously invoke Horton's right to counsel during the interrogation.

Two of Horton's references to an attorney, however, were more specific. When asked the identity of the Ann Arbor shooter, Horton said that "he did not want to give that information [ ] without—until he had spoke [sic] to his attorney." *Id.* at 473. And when Monroe pressed Horton about how he had obtained the clerk's car, Horton responded that "he didn't want to tell that until he had a lawyer present or an attorney present." *Id.* at 452. The Michigan Court of Appeals concluded that these were limited invocations of Horton's right to counsel. *Horton*, 2007 WL 127825, at *2. Given the specificity of Horton's comments—that he did not want to provide specific pieces of information without first consulting an attorney—the state court's view that these were limited invocations was reasonable. Under AEDPA, the state court's conclusion was not "so

- 15 -

No. 22-1084, *Horton v. Chapman*

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Accordingly, the Michigan Court of Appeals decision did not reflect an unreasonable application of clearly established federal law.

## VII.

Horton alternatively requests that, if habeas relief is not warranted on the current record, the case be remanded to the district court for an evidentiary hearing. Habeas review, however, is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing 28 U.S.C. § 2254(d)(1)). Because our review "focuses on what a state court knew and did, . . . [i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id.* at 182–83.

Here, the state court record "precludes habeas relief under the limitations of § 2254(d)," *Id.* at 183 (citing *Schriro v. Landrigan*, 550 U.S. 465 (2007)), so we will not remand for an evidentiary hearing.

## VIII.

Accordingly, we deny Horton's motion for an evidentiary hearing and affirm the district court's judgment.

- 16 -

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-1084

RASON ANGELO HORTON,

    Petitioner - Appellant,

  v.

WILLIS CHAPMAN, Acting Warden,

    Respondent - Appellee.

**FILED**
Apr 28, 2023
DEBORAH S. HUNT, Clerk

Before: GIBBONS, THAPAR, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk